**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JON SPENGLER,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. C2-05-977** |
| | : | |
| **v.** | : | **JUDGE MARBLEY** |
| | : | **Magistrate Judge Kemp** |
| **WORTHINGTON CYLINDERS,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Jon Spengler brought this action against Defendant Worthington Cylinders

("WC") alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

§§ 621 *et seq*.  Presently before the Court are WC's: (1) motion for summary judgment;

(2) WC's motion to strike Spengler's opposition to WC's summary-judgment motion; (3) WC's

motion for leave to file a second summary-judgment motion as to Spengler's ADEA retaliation

claim; and (4) Spengler's motion for leave to file a surreply in opposition to WC's summary-

judgment motion.  For the reasons described below, the Court: (1) **GRANTS** WC's motion for

summary judgment as to Spengler's ADEA discrimination claim; (2) **DENIES** WC's motion to

strike Spengler's opposition; (3) **DENIES** WC's motion for leave to file a second summary-

judgment motion as to Spengler's ADEA retaliation claim, and **DENIES** WC summary

judgment on this claim; and (4) **GRANTS** Spengler's motion for leave to file a surreply to WC's

summary-judgment motion.

## II.  BACKGROUND

### A.  Facts

WC manufactures pressure cylinders used to hold liquid propane, refrigerant, and industrial gases.  It employs both regular, full-time ("RFT") employees and, during its busy periods, temporary, or "seasonal" employees.  During its peak periods, WC employs about 120 seasonal employees.

WC hired Spengler as a seasonal employee in January 2004.  Spengler was fifty-three years old at the time.  He started out manning a spraywash, but after performing well in this capacity, he was assigned to operate the presses.[1]  Between February and August 2004, Spengler underwent three employee evaluations.  On the first two evaluations, Spengler earned the second highest of five overall ratings, thus designating him "definitely above average," but short of the highest rating, "outstanding."  Spengler's rating dropped to "doing an average job," the third-highest rating, on his last evaluation in August, apparently as a result of quality-control issues.

Despite the decline in Spengler's evaluation, Pressroom Supervisor Dennis Huggins recommended him for consideration as an RFT employee in November 2004.  WC hires RFT employees from the ranks of its seasonal employees.  The company follows a multi-stage process for selecting RFT employees from among "the best of the best" of its seasonal employees.  First, WC's Plant Manager, John Hoffman, asks supervisors to recommend seasonal employees for RFT consideration.  Typically, fifteen to twenty names are compiled.  Second, a management team reviews pertinent information about each candidate, including his/her job within the

---

[1]The parties' filings do not explain what a "spraywash" or a "press" is in the context of WC's business, or how such machinery functions.

2

company, attendance record, and evaluation ratings.  The management team may eliminate some candidates at this stage, while selecting others for further investigation.  Third, additional information about the remaining candidates is collected by asking them to sit for interviews or talking informally with their RFT co-workers.  Next, the management team ordinally ranks each candidate, then submits the names of the top-ranked candidates to WC's Employee Council.  Finally, the Employee Council, which consists of existing RFT employees, solicits feedback from other RFT employees about the candidates selected by the management team.  If feedback on a candidate is positive, WC extends the candidate an offer of RFT employment.  If the response to a candidate is unfavorable, the candidate will not be elevated to RFT status, and may face disciplinary action.

In November 2004, thanks to Huggins's recommendation, Spengler was one of thirteen candidates considered for RFT employment.  The management team ranked Spengler eighth but submitted only the top six candidates to the Employee Council.  Thus, Spengler did not obtain RFT employment.

Following this rejection, Spengler asked his shift supervisor how he could improve his chances of obtaining RFT employment.  His shift supervisor advised him to "keep doing what you've been doing," and further said that he had an excellent chance to secure an RFT job in the next hiring cycle.

Knowing that Spengler wanted to obtain RFT employment, Huggins approached him in December 2004, with an offer to recommend him to WC's Steel Division.  According to Spengler, Huggins told him that the Steel Division is "less strenuous" and that Spengler "probably ha[d] trouble keeping up with the younger guys" in the Cylinder Division, where

Spengler had been working in the pressroom.  Spengler asked if Huggins would still recommend him for RFT status in the Cylinder Division.  Huggins said that he would, but cautioned that he did not think Spengler had more than a fifty-fifty chance of getting RFT work in the Cylinder Division.  Spengler testified that when he asked Huggins to explain the basis for this prediction, Huggins replied that it was just a "feeling" he had.  Thus, Huggins encouraged Spengler to consider the transfer to the Steel Division.  True to his word, however, Huggins also submitted Spengler's name as an RFT candidate in the Cylinder Division during the next hiring round, at the end of December 2004.

Spengler was "disturbed" by his conversation with Huggins, believing that Huggins appeared biased against him as a result of his age.  Spengler therefore emailed Hoffman to find out if WC had declined to elevate him to RFT status due to his age.  Hoffman met with Spengler on January 16, 2005.  According to Hoffman, he told Spengler that he took his allegations of age discrimination "very seriously" and that he "would never tolerate that."  Hoffman then explained that the Steel Division was regarded as WC's most prestigious, and that "[w]e don't ask just anybody to go over there."  Hoffman told Spengler that he "should be honored or happy that he earned the opportunity to be asked to go to [S]teel."

Following his conversation with Spengler, Hoffman talked to Huggins about Spengler's concern that he was being discriminated against on account of his age.  Spengler testified that, thereafter, Huggins's attitude toward him changed.  For example, Spengler testified that Huggins kept his distance and refused to make eye contact with him.  On February 9, 2005, Huggins called Spengler into his office and terminated him.  Huggins told Spengler that he was being fired on the basis of negative comments from Spengler's co-workers about his attitude and

4

interpersonal skills.  When Spengler inquired about transferring to another shift or the Steel Division, Huggins told him that it would not do any good and that Huggins would not recommend him for the Steel Division.  Spengler testified in his affidavit that, "When I asked Huggins how I had gone from a valued employee worthy of full-time consideration with Huggins' recommendation to now being terminated, Huggins once again stated that the comments of other employees had led to his decision."

According to WC, it first became aware of Spengler's interpersonal problems at the end of December 2004, following Spengler's second nomination for consideration as an RFT employee.  Hoffman testified that while casually soliciting feedback from employees about RFT candidates, he got the sense that Spengler's co-workers did not approve of him.  Hoffman therefore instructed Huggins to investigate further.

Huggins testified that this was the first time Hoffman had ever asked him to investigate an RFT candidate by talking with the candidate's co-workers.  Huggins learned that Spengler's co-workers regarded him as condescending and as someone who was not a team player.  Huggins elaborated that Spengler "belittled other people, didn't work well with the others, and it wasn't a give-and-take system there."  In their depositions, WC employees Mark Huffman, Jason Fee, and Brian Osborne, among others, confirmed these perceptions.  Huffman testified that Spengler was self-centered on the job and devalued teamwork.  Huffman based his view on an incident in which Spengler took a newer piece of equipment for himself while relegating the older equipment to less experienced press operators.  Huffman recalled Spengler saying, "Screw 'em.  Screw 'em.  I'm using it."  Fee testified that Spengler did not respond favorably to constructive advice:  "As an employee, he wouldn't take what you—like, you give advice.  He

5

didn't take it constructively like you were trying to help him.  He knew how he was going to do it, and that's the way it was going to be."  Osborne testified that although he did not have any unpleasant experiences with Spengler, he observed Spengler exhibiting a negative attitude while interacting with others.

No one from WC, including Hoffman and Huggins, discussed Spengler's alleged interpersonal and teamwork deficiencies with him, nor did WC record any such concerns in any of the three employee evaluations that Spengler received between February and August 2004. WC's Human Resources Manager, Kelly Shroyer, testified that WC follows a progressive discipline policy whereby an offender is subjected to an escalating series of penalties prior to being terminated.  Shroyer testified that only an offense that is "serious enough" would warrant immediate termination, such as fighting on the job, dishonesty, stealing, and knowingly performing a job incorrectly.

Huggins testified that he could not recall whether he consulted with anyone about how to handle Spengler's interpersonal-skill deficiencies.  In any event, given the negative feedback from Spengler's co-workers, Huggins decided to terminate him.  When asked at his deposition why he did not discipline or suspend Spengler, rather than fire him, Huggins testified that he considered the negative feedback sufficient to justify the termination.  Additionally, Huggins testified that he felt that there was no point to retaining Spengler because Spengler's negative reputation among his co-workers probably meant that his efforts to obtain RFT employment were doomed.  Huggins admitted, however, that WC did not have a written policy requiring termination of a seasonal employee who failed to attain RFT status.  Huggins also admitted that

he never told Spengler that he was in jeopardy of losing his job if he failed in his second bid for RFT employment.

### B.  Procedural History

Spengler filed this action on October 26, 2005, asserting two statutory grounds for relief, including violation of (1) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and (2) Ohio's anti-discrimination statute, Ohio Revised Code ("O.R.C.") § 4112.02.  WC brought an unopposed motion to dismiss Spengler's state-law claim under Federal Rule of Civil Procedure 12(b)(6).  This Court granted that motion on June 16, 2006. *Spengler v. Worthington Cylinders*, 438 F. Supp. 2d 805 (S.D. Ohio 2006).

WC now moves for summary judgment on Spengler's ADEA claim.  WC argues that it did not improperly consider Spengler's age in its refusal to elevate him to RFT status or in its decision to terminate him.  Rather, WC contends that the evidence shows that its decisions turned on the complaints of Spengler's co-workers about his poor work attitude and his inability to work cooperatively.  Accordingly, WC contends that summary judgment is appropriate because there are no disputed issues of fact requiring a trial.

Spengler does not oppose summary judgment for WC on his age-discrimination claims. Instead, Spengler argues that summary judgment is improper insofar as he has alleged an ADEA claim for retaliatory discharge.  WC responds that Spengler did not plead a retaliatory-discharge claim in his complaint, and cannot now revise his theory of the case in order to defeat summary judgment.  WC further contends that Spengler did not exhaust his administrative remedies because he did not assert a retaliation claim in his EEOC charge.  For these reasons, WC moves

to strike Spengler's opposition to WC's motion for summary judgment.  WC also moves for

leave to file a second dispositive motion challenging Spengler's retaliation claim.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where the record shows that "there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). The movant has the burden of proving the absence of any genuine issues of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether the

movant has met his burden, the Court views the evidence in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The central inquiry is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### IV.  ANALYSIS

WC argues that Spengler's retaliatory-discharge claim is not properly before the Court.

In considering this issue, the Court first examines whether Spengler pleaded this claim in his

complaint, and then turns to whether retaliatory discharge is fairly encompassed by the facts set

forth in Spengler's EEOC charge.  Concluding that Spengler has properly asserted a retaliatory-

discharge claim, the Court analyzes whether WC is entitled to summary judgment on this claim,

and finds that it is not.

#### A.  Spengler Asserted a Retaliatory-Discharge Claim in his Complaint

WC is correct in arguing that a plaintiff may not defeat summary judgment by asserting a

claim that he did not plead in the complaint.  *Tucker v. Union of Needletrades, Indus., and*

*Textile Workers*, 407 F.3d 784, 787-88 (6th Cir. 2005) (instructing that if discovery reveals a claim not previously raised, the plaintiff should seek to amend the complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure).

Here, the words "retaliation" and "retaliatory discharge" do not appear anywhere in the complaint.  Spengler pleaded only two generalized counts, one for violation of the ADEA and the second for violation of O.R.C. § 4112.02.  He did not separately plead a count for retaliatory discharge, and although he correctly set forth the statutory cite to the ADEA as 29 U.S.C. § 621 *et seq.*, Spengler nowhere mentioned the specific provision of the ADEA (29 U.S.C. § 623(d)[2]) that outlaws retaliation.  Of course, Spengler was not required to plead a particular legal theory, but only sufficient facts showing his entitlement to relief.  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (stating that in pleading a complaint, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'") (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). Although Spengler did not allege a separate count of retaliatory discharge in violation of the ADEA, and although prudence and good practice suggest that it is better to do so, Spengler's allegations were sufficient to apprise WC of the claim.

---

[2]This section provides:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

First, in the factual section of the complaint, Spengler alleged the following:

> [At the meeting with Hoffman], [p]laintiff asked whether his age was a factor in the decision not to promote him in November and January, which the plant manager [Hoffman] denied.
>
> Several weeks passed and Plaintiff had no interview with the steel division as promised. ***The pressroom supervisor's [Huggins's] demeanor towards Plaintiff changed and he would avoid eye contact and speaking to Plaintiff.***
>
> ***On February 8, 2005, the pressroom supervisor called Plaintiff into his office and terminated him*** because of undocumented derogatory comments made by co-workers regarding Plaintiff.

(Compl. ¶¶ 12-14 (emphasis added).)

More directly, in count one of the complaint, Spengler alleged that he ***"was terminated as a result of his complaints regarding his age being a factor in the decision to not promote him."*** (Compl. ¶ 19 (emphasis added).)  With the exception of an allegation that actually uses the word "retaliation," it is difficult to imagine a plainer assertion of retaliation than this. Similarly, Spengler asserted that WC "willfully discriminated against [him] due to his age ***and his complaints regarding age discrimination***."  (Compl. ¶ 20 (emphasis added).)

At oral argument, counsel for WC conceded that fairly read, paragraphs nineteen and twenty of the complaint were sufficient to raise a retaliatory-discharge claim.  Nonetheless, counsel for WC insisted that Spengler still did not provide fair notice of the claim because he failed to invoke Title VII anywhere in the complaint.  WC's argument appears to be predicated on the view that a retaliatory-discharge claim can be raised only under Title VII.  This is mistaken.  The ADEA contains its own anti-retaliation provision and there is no dispute that

10

Spengler pleaded his claim under the ADEA.[3]  *See EEOC v. Sundance Rehab. Corp.*, 466 F.3d

490, 492 (6th Cir. 2006) (acknowledging separate claims for retaliation under the ADEA and

Title VII).

Because Spengler did provide notice of his retaliation theory of liability in his complaint,

this case is fundamentally different from those cases in which courts have rejected the attempts

of parties to defend against summary judgment by raising altogether new claims.  In *Tucker*, for

example, the Sixth Circuit held that "[e]ven construing the allegations in [the complaint] as

generously as possible," the plaintiff pleaded only that she was entitled to relief because she was

covered by a collective-bargaining agreement.  407 F.3d at 788.  Therefore, she could not argue

for the first time on summary judgment that even if she was not covered by the collective-

bargaining agreement, she was still entitled to relief on a promissory estoppel theory.  *Id.*

Similarly, in *Rhea v. Fifth Street Hi-Rise, Inc.*, No. 04-374-C, 2006 U.S. Dist. LEXIS 64419, *6-

8 (W.D. Ky. Sept. 8, 2006), the court held that the plaintiff could not maintain claims under the

Kentucky Civil Rights Act and Kentucky common law at the summary-judgment stage because

she did not plead these claims in her complaint.  The *Rhea* court further noted that through more

than two years of litigation, "every substantive motion and order of record . . . referred to Title

VII, and only Title VII, as the basis for the plaintiff's lawsuit."  *Contra Johnson v. Midland

Credit Mngmnt., Inc.*, No. 05-1094, 2006 U.S. Dist. LEXIS 60133, *27 (N.D. Ohio Aug. 24,

2006) (holding that the plaintiff's complaint was broad enough to cover the theory of liability

---

[3]Following oral argument, Spengler moved for leave to file a surreply to explain that
Title VII has no bearing on his claims because the ADEA authorizes an independent action for
retaliation.  As mentioned above, the Court **GRANTS** this motion.

that the plaintiff asserted on summary judgment and that "[t]he allegedly 'new' claim [did] not fundamentally alter the lawsuit").

WC argues that this Court's order dismissing count two of the complaint, *Spengler*, 438 F. Supp. 2d at 805 ("Dismissal Order"), conclusively shows that the Court and the parties believed that Spengler's case was predicated solely on age discrimination, not retaliation.  In support, WC points to language in the Dismissal Order characterizing Spengler's complaint as alleging age-discrimination claims:

> Count I of Plaintiff's complaint (the "Complaint") alleges age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.  Id.* ¶¶ 17-21.  Count II alleges age discrimination in violation of Ohio Revised Code § 4112.02.  *Id.* ¶¶ 22-23.

*Spengler*, 438 F. Supp. 2d at 806-07.  WC also correctly notes that in the wake of this Court's issuance of the Dismissal Order, Spengler did nothing to clarify that he alleged a retaliatory-discharge claim, in addition to his age-discrimination claims.

Contrary to WC's arguments, this Court's two-sentence synopsis of Spengler's claims in the Dismissal Order is not dispositive of whether Spengler pleaded a retaliatory-discharge claim, especially where the Dismissal Order dealt only with count two, Spengler's state-law age-discrimination claim, and not his ADEA claims.  Spengler may have reasonably believed that there was no need to address the Court's characterization of his claims because WC did not attack the ADEA claim.

Moreover, adopting WC's logic, Spengler points out that the order issued by Magistrate Judge Kemp following the parties' Rule 16 conference describes the issues in the case as follows:  "This is an age discrimination case.  Plaintiff claims that a younger and less qualified

person was hired for a full-time job with defendant, for whom plaintiff had been working as a temporary employee, and *that his employment was terminated after he questioned the hiring decision*."  (Pl.'s Opp. to Def.'s Mot. to Strike, Ex. A, at 2 (emphasis added).)  The Magistrate Judge's order does not precisely state that retaliatory discharge is a claim at issue, but it gives rise to such an inference.  In any event, what is controlling is not this Court's articulation of Spengler's claims in either the Dismissal Order or the Rule 16 Order, nor is it the parties' conduct in allegedly acquiescing to those characterizations.  Rather, what controls are the allegations in the complaint.  As already discussed, Spengler's pleading could have been more precise, but it was sufficient to put WC on notice that Spengler sought relief in part on the basis of unlawful retaliation.

## B.  Spengler Raised Retaliation in his EEOC Charge

WC moves to strike Spengler's opposition to WC's motion for summary judgment on the grounds that Spengler did not assert a retaliation claim in his EEOC charge, and that therefore Spengler is barred from litigating such a claim in this Court because he did not exhaust his administrative remedies.  WC is wrong.

An ADEA plaintiff must exhaust his administrative remedies before filing suit by filing a charge of discrimination with the EEOC.  29 U.S.C. § 626(d)(2).  "The purpose of [this] requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation."  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).  The exhaustion requirement, however, "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact

13

wording which might be required in a judicial pleading.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980)).  The Sixth Circuit has repeatedly stated that the EEOC charge "should be liberally construed to encompass all charges reasonably expected to grow out of the charge of discrimination."  *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992).  Thus, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002).

WC argues that Spengler did not file a retaliation charge with the EEOC.  True, Spengler did not check the box marked "retaliation" on his EEOC charge and he did not use the word "retaliation" in his accompanying affidavit.  However, the Sixth Circuit has explained that a plaintiff's failure to check the appropriate box on an EEOC charge is not dispositive of whether he has satisifed the exhaustion requirement.  *See Dixon*, 392 F.3d at 217-18 (holding that the plaintiff successfully exhausted his administrative remedies even though he did not check the "reprisal" box on his administrative complaint); *Bray v. Palm Beach Co.*, 907 F.2d 150, 1990 U.S. App. LEXIS 11020, *5 (6th Cir. 1990) (unpublished per curiam) (stating that "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge").

Here, Spengler's affidavit in support of his charge plainly gives notice of his retaliation claim.  Paragraph "i" of the affidavit, ignored by WC, states:

> I believe my termination was all about my last meeting with the
> plant manager [Hoffman].  I believe the pressroom supervisor
> [Huggins] resented having to deny making the comment about my
> age.  And after that, he was clearly not pleased with me.  He alone

14

> was determined that I should bee [sic] terminated . . . .  I was told I
> would not be rehired for the pressroom or for any other area or
> shift.  It was clear this was a personal vendetta that could be traced
> back to his comment about my age.

(Def.'s Reply In Supp. of its Mot. for Summ. J., Ex. A.)  These allegations were sufficient to put

both the EEOC and WC on notice of Spengler's retaliation claim.

In *Dixon*, the Sixth Circuit reversed the district court's judgment that the plaintiff had

failed to exhaust his administrative remedies on his retaliation claim.  In his EEOC complaint,

Dixon expressly alleged that his FBI supervisor discriminated against him because he was black.

392 F.3d at 217.  Like Spengler, Dixon did not check the appropriate box to show that he

intended to assert a retaliation claim, nor did he use the word "retaliation."  *Id.* at 217-18.  The

Sixth Circuit nonetheless concluded that "[a]pplying the expected scope of investigation test,"

the following factual allegation in Dixon's administrative complaint was "sufficient to put the

EEOC on notice that Dixon perceived himself to be a victim of retaliation, in addition to race

discrimination": "I contend that [my supervisor] discriminated against me . . ., because of Race, .

. . and because the Applicant Program was removed from [my supervisor's control] . . . .  *Id.* at

217-18.

The factual allegations deemed sufficient in the *Dixon* EEOC charge were less precise

and detailed in raising a retaliation claim than Spengler's allegations here.  If Dixon's allegation

that his supervisor's duties were curtailed because of Dixon's complaints about race

discrimination were sufficient to exhaust Dixon's administrative remedies on his retaliation

claim, then Spengler's far more specific allegations—that his "termination was all about [his]

last meeting with" Hoffman, that thereafter Huggins "was clearly not pleased with [him]" and

that Huggins "alone was determined that I should bee [sic] terminated" and that "this was a

15

personal vendetta that could be traced back to [Huggins's] comment about my age"—are  also sufficient to exhaust Spengler's administrative remedies.

### C.  WC Is Not Entitled to Summary Judgment on Spengler's Retaliation Claim

1.  <u>The Court Denies WC's Request to File a Second Summary-Judgment Motion</u>

Given the Court's conclusion that it may consider Spengler's retaliation claim, WC asks the Court for leave to file a second summary-judgment motion, this time challenging the retaliation claim.  The Court denies WC's request.  Discovery in this matter is closed and the dispositive motion deadline passed on December 29, 2006.  *See Egbert v. Nissan N. Am., Inc.*, No. 04-00551, 2006 U.S. Dist. LEXIS 28730, *1-3 (D. Utah May 8, 2006) (denying the defendant's request to file a second summary-judgment motion where more than eight months had passed since the dispositive-motion deadline and where the arguments the defendant intended to present in its second motion were available to it at the time it filed its first motion); *Lindsey Masonry Co. v. Danis Envtl. Indus., Inc.*, No. 01-2477, 2003 U.S. Dist. LEXIS 16664, *4 (D. Kan. Sept. 12, 2003) (denying motion for leave to file a second summary-judgment motion brought more than a year after the dispositive-motion deadline).  Parties are generally expected to set forth all their arguments in support of summary judgment in a single dispositive motion; piecemeal litigation at the summary-judgment stage is disfavored.  *See e.g. Boise Tower Assocs., LLC v. Washington Capital Joint Master Trust*, No. 03-141, 2007 U.S. Dist. LEXIS 24963, *39 (D. Idaho Apr. 2, 2007) ("Although successive motions for summary judgment are not categorically barred, they are generally disfavored in federal court.").

Moreover, as explained above, the allegations in Spengler's complaint and EEOC charge were sufficient to apprise WC of his retaliation claim.  WC had an obligation to review carefully

16

these filings.  If WC believed that Spengler's allegations were insufficient to plead a claim for

retaliation, it could have moved to dismiss for failure to state a claim under Rule 12(b)(6).

Similarly, if WC harbored some doubt as to whether Spengler intended to assert a retaliation

claim, it could have moved for a more definite statement under Rule 12(e).  WC did neither.

Instead, it moved to dismiss Spengler's state-law claim only, proceeded through discovery, and

then brought its summary-judgment motion challenging Spengler's age-discrimination claim.

Finally, the Court notes that in its reply brief in support of its motion for summary

judgment, WC briefed the merits of Spengler's retaliation claim, thus belying any contention that

justice requires affording WC a second bite at the apple.  Under these circumstances, the Court

denies WC's request, but will analyze whether WC is entitled to summary judgment on

Spengler's retaliation claim on the basis of the existing briefing and factual record.

### 2.  Methods of Proof

Retaliation plaintiffs may prove their claims through either direct or circumstantial

evidence.  Direct evidence is evidence that is free of inferences and that, if believed, requires a

finding that "unlawful discrimination was at least a motivating factor in the employer's actions."

*Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).  Frequently, a retaliation plaintiff

will not be able to adduce direct evidence of discrimination.  *Hopson v. DaimlerChrysler Corp.*,

306 F.3d 427, 436 (6th Cir. 2002) (noting that the circumstantial-evidence method of proof

"arose out of the Supreme Court's recognition that direct evidence of an employer's motivation

will often be unavailable or difficult to acquire'") (quoting *Sheridan v. E.I. DuPont de Nemours*

*& Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996)).  A plaintiff may still prevail under the

circumstantial-evidence approach by "showing the existence of facts which create an inference of discrimination." *Talley*, 61 F.3d 1241, 1248 (6th Cir. 1995).

Here, Spengler has not adduced direct evidence of retaliation, so his ADEA-retaliation claim is governed by the familiar burden-shifting framework of *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973). First, the plaintiff must make out a prima facie case of retaliation by showing that: (1) the plaintiff engaged in a protected activity; (2) the defendant had knowledge of the plaintiff's protected conduct; (3) the defendant took an adverse employment action towards the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Weigel*, 302 F.3d at 381. If the plaintiff succeeds in making out a prima facie case, "the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000) (internal quotation marks and citation omitted). If the defendant satisfies its burden, the burden shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

(a) Prima Facie Case of Retaliation

WC does not dispute that Spengler has satisified the first three elements of the prima facie case. WC contends, however, that Spengler has not shown a causal connection between the protected activity (Spengler's complaint to Hoffman about age discrimination) and the adverse action (his termination).

18

The Sixth Circuit has characterized the showing that a discrimination-plaintiff must make at the prima facie stage as "low" and "minimal." *See Bryson v. Regis Corp.*, No. 06-5137, 2007 U.S. App. LEXIS 19481, at *22 (6th Cir. Aug. 16, 2007) (stating that an FMLA plaintiff must make only a "low threshold showing . . . to survive the prima facie stage of proof"); *Dixon*, 481 F.3d at 333 (stating that "[t]he burden of proof at the prima facie stage is minimal . . . ."); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) (stating that "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one").

Temporal proximity between the protected activity and the adverse employment action "'coupled with other indicia of retaliatory conduct,'" may serve as the basis for finding a causal connection. *Dixon*, 481 F.3d at 333 (quoting *Randolph*, 453 F.3d at 737).

WC does not dispute that Spengler's age-discrimination complaints to Hoffman on January 16, 2005, and his termination on February 9, 2005, were close in time. Instead, WC argues that Spengler has not put forth sufficient additional evidence of retaliation. WC's contention is meritless.

The evidence shows that Spengler complained to Hoffman about age discrimination, as a result of Huggins's suggestion that Spengler consider transferring to the Steel Division. Hoffman testified that he conveyed Spengler's concerns to Huggins and questioned Huggins about what he said to Spengler. Thereafter, Spengler testified that "Huggins' demeanor toward [him] clearly changed": Huggins avoided direct interaction with Spengler and refused to make eye contact with him. Moreover, the evidence shows that Huggins did not follow through on his promise to refer Spengler to the Steel Division, that Huggins withdrew Spengler's name from the RFT selection process, and that, prior to terminating him, Huggins never talked with Spengler

19

about his co-workers' criticisms.  This evidence, along with the temporal proximity between

Spengler's complaints to Hoffman and his discharge, is sufficient to establish a causal

connection.

(b) WC's Legitimate, Non-Discriminatory Reason

The burden now shifts to WC to present evidence showing that it terminated Spengler for

a legitimate, non-discriminatory reason.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07

(1993) ("The defendant must clearly set forth, through the introduction of admissible evidence,

reasons for its actions which, if believed by the trier of fact, would support a finding that

unlawful [retaliation] was not the cause of the employment action.") (internal quotation marks

and citation omitted).  WC argues that the evidence shows that its termination decision was

predicated exclusively on the negative comments of Spengler's co-workers.  In support, WC has

submitted the deposition testimony of several employees, who confirm that they viewed

Spengler as having an attitude problem and as someone who was not a team player.  This is

sufficient to shift the burden back to Spengler to show that WC's articulated reason is pretextual.

(c) Pretext

Contrary to WC's arguments, the record reflects factual disputes that make summary

judgment improper.  Taking the evidence in the light most favorable to Spengler, a reasonable

factfinder could conclude that Huggins terminated Spengler in retaliation for complaining to

Hoffman about Huggins's allegedly age-based remarks.

First, the undisputed evidence shows that Huggins discharged Spengler approximately

three weeks after Spengler met with Hoffman.  During this period, Spengler testified that

Huggins was distant, and Huggins does not contradict this assessment.  Although Huggins knew

20

that Spengler perceived his comments during their conversation about the Steel Division to be discriminatory, Huggins apparently never approached Spengler to correct Spengler's impression, or to reassure him that Huggins regarded Spengler's age as irrelevant to his employment opportunities at WC.

Second, the complaints from Spengler's co-workers about his work attitude were certainly negative, but a reasonable factfinder could conclude that they did not amount to a fireable offense, at least where neither Hoffman, nor Huggins, nor anyone else at WC discussed the deficiencies with Spengler and gave him an opportunity to improve. WC does not argue, and the record does not reflect, that WC had terminated any other employees immediately upon learning that they exhibited interpersonal-skill deficiencies similar to Spengler's. Especially where WC followed a progressive discipline policy, and where WC's Human Resources Manager testified that termination for a first offense is usually reserved for misconduct such as fighting on the job, dishonesty, and stealing, a reasonable factfinder could conclude that Huggins discharged Spengler in retaliation for Spengler's complaints about age-discrimination.[4]

Finally, as Spengler points out, on January 16, 2005, he was regarded as a valuable employee, so valuable, in fact, that he merited a referral to the prestigious Steel Division and a nomination as an RFT candidate in the Cylinder Division. By February 9, 2005, with no change

---

[4]WC suggests that Huggins terminated Spengler because Huggins concluded that, given the negative feedback of Spengler's co-workers, Spengler would never make it past WC's Employee Council, and therefore would never attain RFT status. Such an argument is misplaced. Even if it is true that Spengler would not have succeeded in becoming an RFT employee, that does not explain why Huggins would terminate him as a *seasonal* worker. Moreover, it cannot be said with any certainty that Spengler would have been rejected by the Employee Council, because Huggins withdrew Spengler's name from the RFT candidates list long before the hiring process ever reached the Employee Council.

in Spengler's performance in the pressroom, Huggins terminated him.  Given the facts of this case, a factfinder could conclude that the only reasonable explanation for such a precipitous drop in Spengler's standing was Huggins's displeasure at having been accused of engaging in age discrimination.

In the end, resolution of this case turns on an assessment of the credibility of the various persons involved, including Spengler, Hoffman, Huggins, and the employees who worked with Spengler and commented negatively on his demeanor.  Summary judgment is therefore improper.

## V.  CONCLUSION

For the foregoing reasons, the Court: (1) **GRANTS** WC's motion for summary judgment as to Spengler's ADEA discrimination claim; (2) **DENIES** WC's motion to strike Spengler's opposition; (3) **DENIES** WC's motion for leave to file a second summary-judgment motion as to Spengler's ADEA retaliation claim, and **DENIES** WC summary judgment on this claim; and (4) **GRANTS** Spengler's motion for leave to file a surreply to WC's summary-judgment motion.

**IT IS SO ORDERED.**


    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**


**DATED: September 24, 2007**